**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael D Henry, | No. CV-25-02996-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Pinal County Community College District, et al., | |
| Defendants. | |

Plaintiff Michael Henry filed this lawsuit after Central Arizona College ("CAC") issued a "no-trespass" order temporarily banning him from CAC property. (Doc. 1.) He sued Pinal County Community College District ("PCCCD"), which operates CAC, CAC Vice President of Student Services Jenni Cardenas, and various police officers who were allegedly involved in implementing the no-trespass order. Defendants moved to dismiss all counts. (Doc. 5.) Their motion is granted.

## I.     Factual Background

Michael Henry's adult son enrolled at CAC as a student and planned to begin classes on August 21, 2023. (Doc. 1 at 3.) He was registered for on-campus housing and arrived at his dormitory August 20, 2023, only to "discover[] that the room was not suitable." (Doc. 1 at 4.) The same day, he was reassigned to another room which was also allegedly "unsuitable." (Doc. 1 at 4.) That afternoon, Henry, who was not on campus, spoke with housing staff and two administrators "to express his frustrations" with his son's housing. (Doc. 1 at 4.) The next day, August 21, 2023, Henry spoke on the phone with Vice President

of Student Services Jenni Cardenas to further express his frustration. (Doc. 1 at 5.) He maintains that during these conversations, he was "audibly upset" but did not make any "direct or indirect threats." (Doc. 1 at 4-7.)

Immediately following the August 21 conversation, Cardenas emailed two CAC Police Department officers explaining Henry had not allowed her to speak during the phone call and she wanted to discuss "trespassing" (banning) him from CAC property. (Doc. 1 at 5.) Two officers met with Cardenas the same day and informed her that although Henry did not make any threats during the call, she had the unilateral authority to issue him a no-trespass notice which police officers would serve. (Doc. 1 at 5-6.) The next day, August 22, 2023, Henry again expressed his frustration in another phone call with Cardenas. (Doc. 1 at 7.) He was not yet aware he may be issued a no-trespass notice. (Doc. 1 at 7.) Cardenas recorded the conversation and then completed an electronic form used to notify relevant staff members of student-related incidents. (Doc. 1 at 7.) Her report noted Henry made "no direct or indirect threats" to her during the August 22 conversation. (Doc. 1 at 7.)

The same day, Cardenas drafted a letter notifying Henry he was not welcome on school grounds. (Doc. 1 at 8.) She also helped two officers (defendants Lara Arnold and CAC police chief Greg Roberts) prepare a flyer about Henry to be shared among CAC police officers. (Doc. 1 at 8.) She and the officers intended to include an image of Henry on the flyer but did not find a suitable one until Roberts accessed Henry's driver's license photograph from the Arizona Motor Vehicle Division ("MVD") database. (Doc. 1 at 8-9.) During his search, Roberts accessed additional information about Henry, some of which— his home address, height and weight, date of birth, and descriptions of vehicles registered to his name—was included on the flyer along with his license photograph. (Doc. 1 at 9-10.) The flyer also explained Henry was banned from PCCCD campuses and noted he had not made "specific threats but is verbally aggressive and confrontational." (Doc. 1 at 10.)

The next day, Roberts emailed the no-trespass flyer to his colleagues, Arnold sent it to the CAC Police Department email, and Cardenas circulated it to CAC departments and staff with instructions to forward it further. (Doc. 1 at 10-11.) CAC police-officer

- 2 -

defendants Christopher D'Souza and Carlos Ruiz-Yanez also traveled to Henry's home in Coolidge that day to deliver a copy of the no-trespass notice. (Doc. 1 at 11.) There was no answer when the officers knocked, and despite two "no trespassing" signs, D'Souza walked to the side of the house and peered over a fence into the backyard. (Doc. 1 at 13-15.) The CAC police officers left but soon returned with six officers from the Coolidge Police Department. (Doc. 1 at 15.) The officers eventually left a copy of the no-trespass order on the porch. (Doc. 1 at 15.)

On August 24, 2023, Roberts sought an injunction against harassment against Henry. (Doc. 1 at 16.) It is not clear on whose behalf exactly the injunction was intended, but Roberts sought it generally "to protect CAC staff members." (Doc. 5 at 7.) Roberts allegedly knew Henry's behavior "did not meet the state statutory requirements for obtaining an injunction against harassment" (Doc. 1 at 16), and the judge ultimately declined to issue it (Doc. 5 at 2-3).

The next week, after reviewing relevant reports and recordings, CAC's legal counsel "determined there was inadequate justification to issue [Henry] a no-trespass notice." (Doc. 1 at 16-17.) The CAC police lifted the no-trespass order the same day, September 5, 2023, though CAC staff did not communicate this to Henry for "several more weeks." (Doc. 1 at 17.)

In August 2025, Henry filed this suit alleging four claims: a 42 U.S.C. § 1983 claim against D'Souza premised on an unreasonable warrantless search in violation of the Fourth Amendment (Doc. 1 at 17); another § 1983 claim against Roberts alleging "abuse of process" (Doc. 1 at 18); a claim alleging a violation of the Driver Privacy Protection Act ("DPPA") against PCCCD, Arnold, Roberts, Cardenas, Ruiz-Yanez, and D'Souza (Doc. 1 at 19); and a § 1983 claim against Roberts, Cardenas, and Arnold alleging a violation of his First Amendment right to access public spaces (Doc. 1 at 22).

## II.    Legal Standard

A motion to dismiss may be granted "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v.*

- 3 -

*Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

### III.   Analysis

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants argue qualified immunity applies to the three § 1983 claims (Doc. 5 at 10), which are alleged only against individual defendants (Doc. 1 at 17-23). Of the claims clearly alleged under § 1983, Henry responded to the defendants' qualified immunity argument as to the First Amendment claim only. (Doc. 6 at 5.) Although it is unclear whether Henry has alleged the DPPA violation also by way of a § 1983 claim, *see Collier v. Dickinson*, 477 F.3d 1306, 1310 (11th Cir. 2007) (finding the DPPA may also be enforced under § 1983), both parties discuss qualified immunity as to that claim as well (Docs. 5 at 12; 6 at 15; 7 at 5-6).

### A.   Unreasonable Search (D'Souza)

Henry alleges D'Souza conducted an unreasonable search when he walked to the side of Henry's house and peered over the fence. (Doc. 1 at 14, 17.) He does not allege any resulting injury, so it appears compensatory damages are not available. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). But "nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights." *George v. City of Long Beach*, 973 F.2d 706, 708 (9th Cir. 1992). Like compensatory damages, awards of nominal damages are prohibited when qualified immunity applies. *Cf. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654

F.3d 975, 988 (9th Cir. 2011) (affirming grant of qualified immunity in suit seeking nominal damages).

"[T]he Fourth Amendment protects not only reasonable expectations of privacy, but also against physical intrusions by law enforcement onto property." *United States v. Dixon*, 984 F.3d 814, 819 (9th Cir. 2020). Courts have "extended Fourth Amendment protection to the curtilage [of] a home." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (simplified). The "curtilage," *i.e.* the "area immediately adjacent to a home," is defined according to four factors: (1) the proximity of the area to the home; (2) whether the area exists within an enclosure surrounding the home; (3) "the nature of the uses to which the area is put"; (4) and "the steps taken by the resident to protect the area from observation by people passing by." *Id*. (simplified). Defendants concede D'Souza entered the curtilage of Henry's home without a warrant when he approached the front door and "the fence around the side of the house." (Doc. 5 at 4-5.) But they argue the knock-and-talk exception to the warrant requirement applies based on the facts alleged in the complaint, or at least that it is sufficiently unclear whether it does such that qualified immunity applies. *United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012).

The knock-and-talk exception "permits law enforcement officers to encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016) (simplified). Based on this exception, Henry acknowledges (Doc. 6 at 2) it was permissible for D'Souza to approach the front door with the purpose of contacting Henry and delivering the no-trespass flyer to him. *See id.* at 1158-59; *Florida v. Jardines*, 569 U.S. 1, 8 (2013). But after no one answered the front door, D'Souza entered the side of Henry's property and looked over the "residential wall." (Doc. 1 at 14.) Henry makes clear his Fourth Amendment violation theory is premised on D'Souza's physical trespass into his side yard (Doc. 6 at 2), not the peek over his fence.

Whether this physical trespass into Henry's side yard to try to find him violates the knock-and-talk exception presents a close and fact-intensive question. *Jardines* established that under the exception, officers may "approach the home by the front path, knock

- 5 -

promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 569 U.S. at 8. The officers' intentions generally must be limited to asking questions of, or attempting to initiate consensual contact with, the occupants of the home. *Lundin*, 817 F.3d at 1159 (citing *Perea-Rey*, 680 F.3d at 1187-88). When invoking the knock-and-talk exception, officers' actions are limited to behavior "any private citizen" might display: when there is no answer at the front door, they usually may not conduct a general investigation or wander elsewhere on the property. *United States v. McNeil*, 126 F.4th 935, 944 (4th Cir. 2025). But officers attempting to locate the homeowner may "bypass the front door" and enter other areas of the curtilage "when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property." *Id*.

Defendants argue D'Souza's presence in the curtilage was lawful under the knock-and-talk exception because a private citizen, after receiving no answer at the front door, would commonly and reasonably go around to the side to see if the occupant is in the backyard. (Doc. 5 at 5.) They have cited no cases supporting that proposition, nor hinted at any specific reasons why D'Souza may have believed Henry was in the backyard. And though "no trespassing" signs are not dispositive in finding an intrusion into the curtilage was unreasonable, *United States v. Ernst*, 857 F. Supp. 2d 1098, 1108 (D. Or. 2012), *aff'd*, 623 F. App'x 333 (9th Cir. 2015), Henry's "no trespassing" signs make it less likely private citizens would take it upon themselves to look into his backyard when trying to locate him.

Accordingly, D'Souza's actions may have been impermissible. But even then, defendants have invoked qualified immunity as to this claim. (Docs. 5 at 10-12; 7 at 5-6.) To overcome that, Henry must demonstrate the contours of the right to be "sufficiently clear [] at the time the allegedly unlawful act [was] [under]taken" such that "a reasonable official would understand that what he is doing violates" it. *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (simplified). It is Henry's burden to show that the constitutional right was clearly established at the time of the violation "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). A plaintiff may do so when he cites case-law addressing the

"specific facts at issue." *Sessions v. Hunt*, No. 3:23-CV-1108-SI, 2024 WL 3540579, at \*5 (D. Or. July 24, 2024), *aff'd sub nom. Sessions v. Cnty. of Columbia*, No. 24-5284, 2026 WL 498345 (9th Cir. Feb. 23, 2026); *see also Romero*, 931 F.2d at 627; *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (despite evidence showing excessive force, qualified immunity applied because plaintiff did not cite case-law showing relevant right was clearly established).

Henry cites no cases suggesting the right to be free from an officer walking to the side of the house when trying to locate him after receiving no answer at the front door is clearly established; indeed, he does not address qualified immunity as to this claim at all (Doc. 6 at 15-18). *See Sessions*, 2024 WL 3540579, at \*5; *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue") (simplified). Accordingly, Henry has not met his burden to overcome qualified immunity and the motion to dismiss is granted on this claim.

## B. Abuse of Process (Roberts)

Henry alleges abuse of process against Roberts for pursuing an injunction against harassment. (Doc. 1 at 18.) The injunction never issued. (Doc. 5 at 2-3.) Henry alleges no injury as a result of the unissued injunction besides general "suffer[ing]," and does not make clear how and when he learned of it. (Doc. 1 at 19.) Henry alleges Roberts pursued the injunction "despite knowing [Henry's] behavior did not meet the state statutory requirements for obtaining an injunction against harassment." (Doc. 1 at 16, 18-19.)

Setting aside whether 42 U.S.C. § 1983 could ever provide a vehicle for a state-law abuse-of-process claim,[1] plaintiffs alleging abuse of process must establish (1) "a willful act in the use of judicial process" which was (2) "for an ulterior purpose not proper in the regular conduct of proceedings." *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1060 (D. Ariz.

---

[1] "42 U.S.C. § 1983 provides the statutory authorization to redress violations only of *federal* civil rights, not state-based rights." *Mooney v. Boli*, No. C 06 7875 SI, 2007 WL 781973, at \*5 (N.D. Cal. Mar. 13, 2007); *see Maney v. Brown*, 91 F.4th 1296, 1302 (9th Cir. 2024).

2012) (simplified), *aff'd sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013). To show an ulterior purpose, the plaintiff must allege the process was used "primarily" to accomplish a purpose other than that which it was designed for. *Id*. So it is not sufficient for a plaintiff to show the defendant acted purely out of spite or "solely for improper retaliatory purposes" if the process was still used to "accomplish the result for which it was created." *Id*. Additionally, plaintiffs must show not only that the defendant used the process primarily for an improper purpose, but also that the defendant's action "could not logically be explained without reference to the defendant's improper motives." *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 889 (Ariz. Ct. App. 2004).

Henry does not properly allege an ulterior purpose. The closest the complaint comes to identifying an improper motive is its allegation Roberts initiated the process "in part" because Henry had attempted to lodge complaints against him and other CAC police staffers. (Doc. 1 at 18-19.) But he also alleges Roberts initiated the process "in part" because of a proper reason: Henry's "forceful[]" communication with CAC staff. (Doc. 1 at 18.) And even if Roberts had initiated the process primarily (or entirely) in retaliation for Henry's complaints, that motive cannot support a claim if the process was still used to accomplish the result for which it was created. *Donahoe*, 869 F. Supp. 2d at 1060. Henry has not alleged Roberts initiated the process for any reason besides hoping to receive an injunction. Ultimately, taking Henry's allegations as true, Roberts' actions "[can] logically be explained without reference to [his] improper motives": Roberts received information Henry had spoken forcefully to CAC staff and sought an order to prevent further harassing communication. *Crackel*, 92 P.3d at 889.

Henry's argument that his behavior did not meet the standard for an injunction against harassment is irrelevant to determining whether Roberts abused the process by pursuing one. (Doc. 6 at 7-9.) And here too, Henry has failed to contest qualified immunity which defendants contend applies. (Docs. 5 at 10; 7 at 5.) He does not offer any case-law showing a clearly-established right to be free from an allegedly-retaliatory injunction that never issued (Doc. 6 at 15-18). *See Sessions*, 2024 WL 3540579, at \*5; *Stichting*

*Pensioenfonds ABP*, 802 F. Supp. 2d at 1132.

The motion to dismiss is granted as to abuse of process.

### C. DPPA (PCCCD, Arnold, Roberts, Cardenas, Ruiz-Yanez, and D'Souza)

Henry alleges defendants violated the DPPA when they accessed and later used MVD information to create the no-trespass flyer. (Doc. 1 at 19.) Along with Henry's photograph, defendants obtained information regarding his home address, date of birth, license plate numbers, height, and weight from the MVD database. (Doc. 1 at 8-9.) Although they did not publish the flyer publicly, it was circulated within the CAC Police Department and college staff. (Doc. 5 at 8.) Again, Henry fails to allege an injury resulting from this violation.

The DPPA restricts the ability of state departments of motor vehicles (like Arizona's MVD) and entities authorized to view their records from disclosing personal information in motor vehicle records. 18 U.S.C. § 2721(a). That personal information includes home addresses, dates of birth, and visual identifying information. *Maracich v. Spears*, 570 U.S. 48, 57 (2013). A plaintiff alleging a DPPA violation must show the defendant (1) knowingly obtained, disclosed, or used personal information; (2) from a personal record; (3) "for a purpose not permitted." *Id*. But many exceptions permit disclosure of that information, including use by any government agency (or private person acting on a government agency's behalf) in carrying out its functions. 18 U.S.C. § 2721(b)(1). The available (albeit limited) case-law regarding this exception suggests it should be read broadly. *See Kost v. Hunt*, 983 F. Supp. 2d 1121, 1134 (D. Minn. 2013) (discussing "congressional intent to leave essentially intact governmental agencies' ability to access and use motor vehicle record data in conducting their operations").

Defendants acknowledge law enforcement officers obtained qualifying personal information about Henry from the MVD, but argue doing so fell squarely under the government use exception because it was for the law enforcement purpose of enforcing a no-trespass order. (Doc. 5 at 8.) Henry contends the exception does not apply because a campus police department's "functions" are limited to those explicitly authorized by

statute, and no relevant statute specifically addresses no-trespass notices. (Doc. 6 at 13-14.) He also argues the officers acted outside their "function" because they delivered the flyer outside CAC Police Department's geographic authority without consent from the Coolidge police. (Doc. 6 at 14.) As for PCCCD and Cardenas (a civilian defendant), Henry argues the exception does not apply because the statute dictating the college district's authority also does not address no-trespass flyers. (Doc. 6 at 13-14.)

Henry provides no case-law suggesting the government use exception is limited to functions or within geographic limits authorized explicitly by statutes. Available case-law does not support reading the DPPA so narrowly. *See Rollins v. City of Albert Lea,* No. 14-CV-299 (SRN/HB), 2016 WL 6818940, at *15 (D. Minn. Nov. 17, 2016); *Bass v. Anoka Cnty.*, 998 F. Supp. 2d 813, 821 (D. Minn. 2014). The DPPA permits a broad range of government and law enforcement activities and focuses primarily on prohibiting data usage for private purposes. *See Kost*, F. Supp. 2d at 1133. Because of the breadth of permissible government purposes and given the expansive terms in which the exception is written, a complaint cannot survive a motion to dismiss if it does not "include factual allegations of an impermissible purpose" for each defendant, evaluated independently. *Id*. at 1134. Without pleading any non-law-enforcement purpose behind issuing and enforcing the no-trespass notice, Henry has no plausible claim against the police officer defendants. And by extension, because the DPPA is "concerned only with the use of the information, not the entity requesting it," PCCCD's and Cardenas' use of the MVD information also falls within the government function exception. *Cook v. ACS State & Loc. Sols., Inc*., 663 F.3d 989, 996 (8th Cir. 2011).

Even if the DPPA claim had been adequately pleaded, Henry has not overcome defendants' assertion of qualified immunity. He relies solely on the DPPA's statutory text as showing his rights were clearly established. (Doc. 6 at 15.) But for the same reasons discussed above, it is not clearly established that the officers' (or administrators') conduct falls outside the government use exception in this particular law enforcement context. Henry has not shown otherwise. *See Mendoza*, 27 F.3d at 1361. The motion to dismiss this

claim is granted.

### D. First Amendment (Roberts, Cardenas, and Arnold)

Henry alleges his First Amendment right to access public spaces was violated by the temporary no-trespass order. (Doc. 1 at 22.) It is not clear what legal theory Henry is attempting to assert. He does not allege any instance where he attempted to visit the campus but was prevented from doing so. Nor does he identify any time he wished to visit the campus but did not do so because of the no-trespass order. In effect, Henry appears to be suing over a no-trespass order that did not impact him in any way. To the extent the court can understand Henry's theory, he has not stated a claim for relief.

College campuses are not automatically designated as public fora and colleges are not required to permit unlimited public access. *Souders v. Lucero*, 196 F.3d 1040, 1043-45 (9th Cir. 1999) (order excluding plaintiff from campus did not violate constitutional rights). Despite conceding "the college has the power, consistent with the First Amendment, to exclude non-students from limited portions of campus for certain periods of time," Henry alleges his rights were violated by defendants' decision to ban him from campus *entirely*. (Doc. 6 at 17.) But even if the whole-campus ban places Henry's case on a different footing, that ban was brief—lasting about two weeks—which appears to partially comport with his concession that the college could exclude him from campus for a defined period of time. (Doc. 1 at 17.) Additionally, his desire to potentially enjoy unnamed "public events and meetings hosted on campus" does not allege the protected speech at issue specifically enough. *Balu v. Jacobsen*, No. C 06-6133 SI, 2007 WL 81908, at *3 (N.D. Cal. Jan. 9, 2007) ("If plaintiff wishes to pursue a claim under the First Amendment, he must plead specific facts describing the protected speech at issue.") An allegation of a possible desire to attend unspecified events and meetings will not support a First Amendment violation. *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999) (no First Amendment injury or standing where plaintiff did not allege a particular event she was unable to attend). And even if it did, Henry has not suggested that the right is clearly established in this factual context such that a reasonable officer or administrator would

know that temporarily enacting the ban would be unconstitutional. *See Mendoza*, 27 F.3d at 1361.

### IV.   Conclusion

Even assuming Henry had sufficiently alleged a statutory or constitutional violation, he has not overcome qualified immunity for the individual defendants. Because this is his first complaint and it is possible he may be able to add additional facts to support his claims, he is granted leave to amend. But he must keep in mind that each claim suffers from multiple pleading issues and an amended complaint, if any, cannot allege facts which are inconsistent with the complaint now challenged. *See Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023).

**IT IS ORDERED** the Motion to Dismiss (Doc. 5) is **GRANTED**. Plaintiff may file an amended complaint no later than **May 19, 2026**. The Clerk of Court shall enter judgment in favor of defendants in the event no amended complaint is filed by that date.

Dated this 4th day of May, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**

- 12 -