**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Michael D Henry,<br><br>Plaintiff,<br><br>v.<br><br>Pinal County Community College District, et al.,<br><br>Defendants. | No. CV-25-02996-PHX-KML<br><br>**ORDER** |

Plaintiff Michael Henry filed this lawsuit after Central Arizona College ("CAC") issued a "no-trespass" order temporarily banning him from CAC property. (Doc. 11.) He sued the Pinal County Community College District ("PCCCD"), a CAC Vice President, and various police officers who helped implement the no-trespass order. The court dismissed the original complaint with leave to amend. (Doc. 8.) Henry filed a First Amended Complaint ("FAC") realleging only two claims against five defendants. (Doc. 11.) Defendants then filed a motion to dismiss (Doc. 13), which is granted in part and denied in part.

## I. Background

Henry's adult son enrolled at CAC as a student and arrived at his on-campus student housing on August 20, 2023. (Doc. 11 at 3.) Henry's son "discovered that the room was not suitable," and after being assigned an alternative room, determined that second room was also not suitable. (Doc. 11 at 3.) Henry was not on campus that day, but on August 21 he "expressed his frustration" via telephone with housing staff and then with Vice President

of Student Services Jenni Cardenas. (Doc. 11 at 3-4.) After speaking with Henry, Cardenas emailed CAC Police Department officers expressing her desire to "trespass[]" Henry, or ban him from CAC property, if possible. (Doc. 11 at 4.) She and two police officers met that same day, and agreed to issue a no-trespass order and serve Henry with notice of it. (Doc. 11 at 5.)

Over the next two days, Cardenas and defendants Greg Roberts (the CAC Police Department Chief) and Laura Arnold (a CAC police department employee) prepared a trespass flyer to notify CAC police officers that Henry was not welcome on the property. (Doc. 11 at 6.) In doing so, Arnold accessed a Department of Motor Vehicles database to find a photograph of Henry, as well as his date of birth, home address, license plate numbers, and various other information which was used on the flyer. (Doc. 11 at 6-7.) On August 23, the flyer was distributed to at least 20 CAC staff and in a personnel-wide CAC Police Department email. (Doc. 11 at 9.)

Also on August 23, CAC police officers Ruiz-Yanez and defendant Christopher D'Souza approached Henry's home to serve him a copy of the no-trespass notice. (Doc. 11 at 9.) Henry's property was marked with two prominently-displayed "no trespassing" signs near the eastern side yard. (Doc. 11 at 11-13.) D'Souza and Ruiz-Yanez knocked several times at the front door and announced themselves. (Doc. 11 at 13.) Henry was home but did not answer. (Doc. 11 at 13-14.) D'Souza then walked past the front door into the eastern side yard and approached a fence to the backyard. (Doc. 11 at 14-15.) He then began "jumping up and down in place" to see over the fence. (Doc. 11 at 14-15.)

Henry alleges D'Souza's actions constituted an unreasonable warrantless search in violation of his Fourth Amendment rights, arguing D'Souza's "presence on his property" exacerbated his pre-existing mental health conditions. (Doc. 11 at 16-18.) He also alleges PCCCD, Arnold, Roberts, and Cardenas violated the Driver Privacy Protection Act ("DPPA"), a federal law protecting against impermissible uses of motor vehicle record data. (Doc. 11 at 18-22.)

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. Analysis

### A. Fourth Amendment (D'Souza)

Officer D'Souza moves to dismiss Henry's Fourth Amendment claim for warrantless search, arguing (1) no search occurred because the "knock-and-talk" exception to the warrant requirement applied, and (2) D'Souza is entitled to qualified immunity regardless of whether he violated the Fourth Amendment. (Doc. 13 at 5-7.)

The Fourth Amendment protects against warrantless physical intrusions by law enforcement onto property that includes a home's "curtilage," which is the "area immediately adjacent to a home." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010). As D'Souza acknowledges (though Henry continues to argue the point for nearly four pages (Doc. 16 at 7-10)), D'Souza entered the curtilage of Henry's home without a warrant. (Doc. 13 at 5-6.) But D'Souza argues the "knock-and-talk" exception applies. (Doc. 13 at 5-6.) That exception "permits law enforcement officers to encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016) (simplified). When invoking the knock-and-talk exception, officers' actions are limited to behavior "any private citizen" might display: when there is no answer at the front door, they usually may not conduct a general investigation or wander elsewhere on the property. *United States v. McNeil*, 126 F.4th 935,

944 (4th Cir. 2025). But officers attempting to locate the homeowner may "bypass the front door" and enter other areas of the curtilage "when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property." *Id.*

This court previously found "D'Souza's actions may have been impermissible" because defendants provided no reasons why D'Souza might have believed Henry was at home or in the backyard and Henry's "no trespassing" signs "make it less likely private citizens would take it upon themselves to look into his backyard" when attempting to locate him. (Doc. 8 at 6.) Though Henry has admitted he was home and the FAC shows an image of what appears to be Henry's vehicle in the driveway (Doc. 11 at 13-15), defendants do not argue any specific "circumstances reasonably indicat[ing] that the officer[s] might find" Henry elsewhere on the property. *Id.* Again, then, D'Souza's actions may have been impermissible. And this time, Henry has sufficiently alleged that D'Souza is not entitled to qualified immunity for those actions.

A police officer sued under § 1983 is "entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 574 U.S. 13, 16 (2014). Henry need not show that "the very action in question has previously been held unlawful," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), but the contours of the right must have been "sufficiently clear [] at the time the allegedly unlawful act [was] [under]taken" such that "a reasonable official would understand that what he is doing violates" it. *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (simplified). It is Henry's burden to show that the constitutional right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In *Florida v. Jardines*, the Supreme Court held that an officer's purpose for entering the curtilage determines whether they had an "implied license" to approach the home and knock on the door. 569 U.S. 1, 10 (2013). To fall within the knock-and-talk exception, that purpose must be in conformance with "the background social norms that invite a visitor to the front door." *Id.* at 9. Typically, the visitor may "approach the home by the front path,

knock promptly, wait briefly to be received, and then (absent an invitation to linger longer) leave." *Id.* at 8. *Jardines* established that for the knock-and-talk exception to apply, the officer's purpose for entering the curtilage must have been within what a private visitor would be impliedly permitted to do. *Id.* at 8-9. That is why "a police officer not armed with a warrant may approach the home and knock," but may not enter the curtilage to conduct a warrantless search. *Id.* at 8-10. After *Jardines*, the knock-and-talk exception "depends at least in part on an officer's subjective intent." *Lundin*, 817 F.3d at 1160.

*Lundin* further clarified the contours of this rule. There, officers exceeded the scope of the knock-and-talk's customary license partly because their "clear purpose was to determine whether Lundin was home and, if so, to arrest him." *Id.* at 1158, 1160. The court explained that the license to knock on the front door is "generally limited to the purpose of asking questions of the occupants," and that other purposes usually "exceed the scope of the customary license." *Id.* at 1159 (simplified). *Lundin* established that entering the curtilage for purposes other than asking the occupant questions—such as "determin[ing] whether [he] was home" to enable a different police function—exceed the scope of the knock-and-talk exception if they also exceed the customary license. *Id.* at 1158.

Defendants provide no clear answer to Henry's argument that persisting around the side of the house to try to deliver information, after receiving no answer at the front door, exceeds the scope of the customary license. (*See* Doc. 16 at 11.) *Jardines* and *Lundin* together make clear that doing so is not permissible, at least without a showing that an ordinary visitor would have done the same. *See Lundin*, 817 F.3d at 1159 ("the government must demonstrate that the officers conformed to the habits of the country by doing no more than any private citizen might do") (simplified). At most, defendants argue that, when looking for a neighbor, a "common and reasonable next step is to go around and look to see if that person is in their backyard." (Doc. 13 at 7.) The court disagrees. On this record at this stage, the court cannot find that a private visitor would think it customary—after receiving no answer at the front door—to venture into the home's side yard, past clearly displayed no-trespass signs, and peek over the backyard fence to locate the homeowner.

*Jardines* clearly established that an officer's purpose for entering the curtilage matters. And *Lundin* clearly established that the purpose of locating a homeowner to carry out a different police duty is an impermissible one under the knock-and-talk exception unless ordinary visitors would customarily do the same. As such, D'Souza had sufficient notice that his conduct may have been improper under the Fourth Amendment and this claim may proceed.

**B. DPPA (PCCCD, Arnold, Roberts, Cardenas)**

The remaining defendants move to dismiss Henry's DPPA claim, arguing the use of Henry's information from the motor vehicle database in the trespass flyer was permissible under either the government-use exception (18 U.S.C. § 2721(b)(1)) or in connection with a proceeding (18 U.S.C. § 2721(b)(4)). Alternatively, defendants claim they are entitled to qualified immunity. (Doc. 13 at 11-12.)

The court previously dismissed Henry's DPPA claim because he relied solely on the DPPA's statutory text in showing that his rights were clearly established and failed to plausibly show that the officers' conduct fell outside the government-use exception. (Doc. 8 at 10.) Henry claims the court made "distinct mistakes of law" in interpreting the government-use exception when dismissing his original claim by failing to look to Arizona law in determining PCCCD's functions. (Doc. 16 at 15.) He provides no other argument as to why the law is clearly established.

The DPPA restricts the ability of state motor vehicle departments (like Arizona's MVD) and entities authorized to view their records from disclosing personal information contained in motor vehicle records. 18 U.S.C. § 2721(a). That personal information includes home addresses, dates of birth, and visual identifying information. *Maracich v. Spears*, 570 U.S. 48, 57 (2013). A plaintiff alleging a DPPA violation must show the defendant (1) knowingly obtained, disclosed, or used personal information; (2) from a personal record; (3) "for a purpose not permitted." *Id.* But many exceptions permit disclosure of otherwise-protected information, including use by any government agency

(or private person acting on a government agency's behalf) in carrying out its functions. 18 U.S.C. § 2721(b)(1).

Henry maintains that a government's "functions" for purposes of the government-use exception must be determined according to state statutes creating or otherwise regulating the relevant agency. (Doc. 16 at 15.) At most, the cases Henry cites show that state law may be relevant to the DPPA functions determination. See *In re Imagitas, Inc., Drivers' Priv. Prot. Act Litig.*, Nos. 3:07-md-2-J-32HTS, 3:06-cv-690-J-32HTS, 2008 WL 977333, at *9 (M.D. Fla. Apr. 9, 2008) (discussing state statutes in determining whether the government-use exception applies, but noting "the imprimatur of a state law grant of authority would be insufficient to legitimize a program that otherwise violated the DPPA"); *Downing v. Globe Direct LLC*, 682 F.3d 18, 24 (1st Cir. 2012) (holding no violation of the DPPA, in part because the inclusion of advertisements in registration renewal notices was allowed by Massachusetts law); *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 960 n.8 (8th Cir. 2021) (declining to decide whether jury instruction that "as a matter of law, any access of DVS records that violates any applicable [MPD] policy, state law, or regulation cannot be carrying out a function of that agency," was error).[1] None of these cases establish the inverse rule that relevant government functions must be delineated with granularity in state law.

But more importantly, even if defendants' actions were impermissible under the DPPA, Henry has not shown it was clearly established defendants must look to state law in determining what their "functions" are. Not only do none of the proffered cases create a rule *mandating* consideration of state law in applying the government-use exception, they do not involve circumstances even remotely similar to the present facts. *See Baas v. Fewless*, 886 F.3d 1088, 1090 (11th Cir. 2018) (authority to engage in lobbying); *Krekelberg*, 439 F. Supp. 3d at 1155 (police searching fellow officers in DMV database); *Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1217 (11th Cir. 2009) (inclusion of commercial advertising in renewal envelopes); *In re Imagitas*, 2008 WL 977333, at *1 (same);

[1] Henry cites the district court's decision, *Krekelberg v. Anoka Cnty.*, 439 F. Supp. 3d 1143, 1155 n.2 (D. Minn. 2020), which was otherwise partially reversed.

*Downing*, 682 F.3d at 19-20 (same). Without deciding whether defendants' actions properly fall within an exception to the DPPA, Henry's claim is dismissed for failure to overcome qualified immunity.

**IV. Conclusion**

Henry's Fourth Amendment claim may proceed, but his DPPA claim is dismissed on qualified immunity grounds. Henry already amended this claim and came no closer to curing the flaws or overcoming qualified immunity. Further leave to amend is denied. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051-52 (9th Cir. 2008) (affirming denial of leave to amend as futile where prior district court order put plaintiffs "on notice . . . of the same defects" that led to dismissal of amended complaint).

**IT IS ORDERED** that defendants' Motion to Dismiss (Doc. 13) is **GRANTED IN PART** and **DENIED IN PART** as explained in this order.

**IT IS FURTHER ORDERED** defendants Pinal County Community College District, Arnold, Robert, and Cardenas are dismissed from this action.

**IT IS FURTHER ORDERED as follows:**

The parties are directed to meet, confer, and develop a Rule 26(f) Joint Case Management Report, which must be filed **<u>within 4 weeks of the date of this order</u>**. It is the responsibility of plaintiff(s) to initiate the Rule 26(f) meeting and prepare the Joint Case Management Report. Defendant(s) shall promptly and cooperatively participate in the Rule 26(f) meeting and assist in preparation of the Joint Case Management Report.

The Joint Case Management Report shall contain the following information in separately-numbered paragraphs.

1. The parties who attended the Rule 26(f) meeting and assisted in developing the Joint Case Management Report;
2. A list of all parties in the case, including any parent corporations or entities (for recusal purposes);
3. Any parties that have not been served and an explanation of why they have not been served, and any parties that have been served but have not answered

or otherwise appeared;

4. A statement of whether any party expects to add additional parties to the case or otherwise amend pleadings;

5. The names of any parties not subject to the court's personal (or in rem) jurisdiction;

6. A description of the basis for the court's subject matter jurisdiction, citing specific jurisdictional statutes. If jurisdiction is based on diversity of citizenship, the report shall include a statement of the citizenship of every party and a description of the amount in dispute. See 28 U.S.C. § 1332;

7. A short statement of the nature of the case (no more than three pages), including a description of each claim, defense, and affirmative defense;

8. A listing of contemplated motions and a statement of the issues to be decided by those motions;

9. Whether the case is suitable for reassignment to a United States Magistrate Judge for all purposes or suitable for referral to a United States Magistrate Judge for a settlement conference;

10. The status of any related cases pending before this or other courts;

11. A discussion of any issues relating to preservation, disclosure, or discovery of electronically stored information ("ESI"), including the parties' preservation of ESI and the form or forms in which it will be produced;

12. A discussion of any issues relating to claims of privilege or work product;

13. A discussion of necessary discovery, which should take into account the December 1, 2015 amendments to Rule 26(b)(1) and should include:

    a. The extent, nature, and location of discovery anticipated by the parties and why it is proportional to the needs of the case;

    b. Suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure;

    c. The number of hours permitted for each deposition. The parties also

should consider whether a total number of deposition hours should be set in the case, such as twenty total hours for plaintiffs and twenty total hours for defendants. Such overall time limits have the advantage of providing an incentive for each side to be as efficient as possible in each deposition, while also allowing parties to allocate time among witnesses depending on the importance and complexity of subjects to be covered with the witnesses;

14. Proposed deadlines for each of the following events. In proposing deadlines, the parties should keep in mind the Case Management Order will contain deadlines to govern this case and once the dates have been set the court will vary them only upon a showing of good cause. A request by counsel for extension of discovery deadlines in any case that has been pending more than two years must be accompanied by a certification stating the client is aware of and approves of the requested extension. The court does not consider settlement talks or the scheduling of mediations to constitute good cause for an extension. The parties must propose the following:

a. A deadline for the completion of fact discovery, which will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). This deadline is the date by which all fact discovery must be completed. Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery disputes. Absent extraordinary circumstances, the court will not entertain discovery disputes after this deadline;

b. Dates for full and complete expert disclosures and rebuttal expert disclosures, if any;

c. A deadline for completion of all expert depositions;

d. A date by which any Rule 35 physical or mental examination will be

noticed if such an examination is required by any issues in the case;

e. A deadline for filing dispositive motions, to be no later than August 19, 2027;

f. Case-specific deadlines and dates, such as the deadline to file a motion for class certification or a date on which the parties are available for a Markman (patent claim construction) hearing;

g. A date by which the parties shall have engaged in face-to-face good faith settlement talks;

h. Whether a jury trial has been requested and whether the request for a jury trial is contested, setting forth the reasons if the request is contested;

i. Any other matters that will aid the court and parties in resolving this case in a just, speedy, and inexpensive manner as required by Federal Rule of Civil Procedure 1;

15. A statement indicating whether the parties would prefer that the court hold a case management conference before issuing a scheduling order—and, if so, an explanation of why the conference would be helpful.

Dated this 19th day of November, 2026.

Krissa M. Lanham

**Honorable Krissa M. Lanham**
**United States District Judge**